**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Mr. and Mrs. Lloyd Odell Ness | ) | |
| | ) | |
| Plaintiffs, | ) | **ORDER GRANTING** |
| | ) | **MOTIONS TO DISMISS** |
| vs. | ) | |
| | ) | |
| Samson Resources, Samson Investments, | ) | Case No. 4:15-cv-00063 |
| KKR (Kravis, Kohlberg, Roberts), Magnum | ) | |
| Hunter, Bakken Hunter, ONEOK Partners, | ) | |
| ONEOK, and OKS, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiffs in this action seek a litany of damages and other relief based on largely conclusory allegations that defendants have engaged in an industry-wide scheme to defraud royalty and other mineral interest owners of the correct amounts owed to them on the production of natural gas, including from oil and gas wells in which plaintiffs have an interest. Plaintiffs are proceeding pro se despite the court's urging that they retain counsel.

Following the first of several motions to dismiss, plaintiffs filed a document entitled "Amendment of Complaint." But, rather than restating and amending the allegations of the original complaint, plaintiffs' amendment attempts to expand upon the parties that plaintiffs claim they are suing and plead additional acts committed in furtherance of the purported fraud— at least as best this court can decipher it.

Finally, and to complicate matters further, several of the defendants filed for bankruptcy before the court could get to the motions to dismiss. This resulted in the court staying the entire action for a considerable period of time while plaintiffs pursued claims in one of the bankruptcy cases. When the court finally lifted its stay of this action, it allowed the parties to supplement the

1

pending motions to dismiss based upon the events that had transpired. What is now before the court are defendants' motions to dismiss as well as certain other motions filed by plaintiffs.

## I.    BACKGROUND

### A.    Plaintiffs' complaint

#### 1.    Plaintiffs' interests

Plaintiffs allege in the complaint that they have an interest in the production from a number of wells that have been drilled in Divide County, North Dakota. The complaint alleges that defendant Samson Resources is the operator of all but one of the wells and defendants Bakken Hunter and Magnum Hunter are the operators of the remaining well.

While alleging that they have an interest in the production from the wells, plaintiffs have not alleged the basis of their claimed interests, *e.g.,* making reference to any deeds, leases, wills, pooling orders, or pooling agreements that might give rise to and govern the scope of their interests. Also, plaintiffs have not alleged the amount of their interests. These points are of some significance later.

#### 2.    Plaintiffs' claims for relief

It is difficult to tell from the complaint's rambling and conclusory allegations what plaintiffs' claims are. However, the general thrust appears to be plaintiffs' belief that they have not been fully compensated for amounts owed on their interests in the production of gas from the wells in which they have an interest because of an industry-wide conspiracy to defraud royalty owners by deducting from amounts payable on their interests expenses that are improper or inflated and using "accounting chicanery" to cover it up. There are also vague and conclusory allegations that the gas from the wells was sold for less than market value and that defendants have in some unexplained fashion managed to limit the market for the sale of the gas. In addition, there are conclusory allegations that

one or more of the defendants was receiving "kickbacks" as purported incentives for their participation in the fraud.

As the basis of their entitlement to relief, plaintiffs allege that the purported fraudulent conduct violated the Sherman Anti-Trust Act, the Sarbanes-Oxley Act of 2002, the Racketeer Influenced and Corrupt Organizations Act ("RICO'), and "The Securities Act" (which they claim is also known as "the truth in securities" Act). Plaintiffs also allege that defendants' purported fraudulent and wrongful acts violated "North Dakota state laws and codifications" but without expressly identifying which ones.

As discussed later, plaintiffs do not appear to have pled any state law causes of action other than, perhaps, fraud. This reading of the complaint is consistent with how plaintiffs themselves have characterized the causes of action being asserted. In the Civil Cover Sheet that plaintiffs completed with the complaint, they stated in both the first and second pages that the causes of action being asserted are for Antitrust, Racketeering, Securities Act fraud and accounting fraud. (Doc. No. 1-1). Also, there are no allegations making reference to specific instruments or agreements that would give rise to a state law claim for breach of contract.

### 3.     Allegations pertaining to the court's jurisdiction

The only basis explicitly alleged in the complaint for the court's jurisdiction is that based on diversity of citizenship. This is consistent with Civil Cover Sheet prepared by plaintiffs in which they checked the box stating that the basis for the court's jurisdiction is "Diversity" and did not check the box for "Federal Question" jurisdiction. (Doc. No. 1-1). Nevertheless, the complaint does allege violations of federal law and whether those allegations are sufficient to provide "federal question" jurisdiction under 28 U.S.C. § 1331 is addressed later.

Plaintiffs' allegations with respect to jurisdiction based upon diversity under 28 U.S.C. § 1332 are also problematic in two respects. The first has to do with whether the allegations sufficiently demonstrate the existence of "complete diversity" of citizenship between plaintiffs and all of the defendants. The only reasonable construction of the complaint is that plaintiffs are claiming they are citizens of the state of Arizona.[1] As for the defendants, the complaint sets forth addresses that, variously, are in the states of New York, Texas, and Oklahoma. But, one of the problems with this is other evidence before the court which makes clear that several of the defendants are limited liability companies or limited partnerships. As to these defendants, plaintiffs have not accounted for the fact that their citizenship is that of their members or partners. This point will be returned to later.[2]

The second problem with respect to plaintiffs' allegations of diversity of citizenship are its threadbare allegations that the amount-in-controversy is between $75,000 and $1,000,000. Given the lack of pled facts setting forth the amount of plaintiffs' interests in the gas production as well as facts that would provide some indication of the delta between what plaintiffs believe they should have received versus what they were actually paid, it cannot be determined from the face of the complaint whether the $75,000 threshold for diversity of jurisdiction could be reached, particularly without the help of plaintiffs' being able to claim attorney's fees or some form of enhanced or penalty damages. In most cases this is not a problem given that it does not take much these days to

---

[1] Plaintiffs allege that they do not dwell in North Dakota and then provide an Arizona mailing address both within the body of the complaint and at the end following their signatures. The only reasonable conclusion that can be drawn from this is that plaintiffs are claiming Arizona as their residence for purposes of diversity of citizenship.

[2] It also cannot be determined from the complaint whether there is complete diversity for the defendants who appear to be corporations since the information in the complaint with respect to where they are incorporated and where they have their principal places of business is incomplete. However, after considering the filings of defendants, the lack of complete diversity does not appear to be a problem with respect to the corporate defendants.

satisfy § 1332's monetary threshold. But, in this case, there is evidence from the one of the bankruptcy proceedings that plaintiffs' interests in the production from the wells in question is relatively small—as compared to the totality of the Ness family interests that plaintiffs are not permitted to represent. Given the small size of plaintiffs' interests, the evidence in the bankruptcy proceeding is that the expenses that were the primary basis for the claims of fraud were less than two thousand dollars for the wells operated by Sansom Resources during the time frame relevant to that proceeding. This probably means that any similar expenses would be even smaller for the one well operated by Bakken Hunter/Magnum Hunter. And, while there is a conclusory allegation that the gas was marketed at below market prices, the gas prices appear to have been depressed thereby reducing any potential damage.

### 4. The defendants named in the complaint

It is apparent from the record now before the court that the names of the defendants in the complaint are not legally precise, so some judgment must be used to determine the identity of the entities plaintiffs have sued. With that said, and for purposes of the analysis that follows, the individual defendants named in the complaint fall within one of the following four groups:

### a. The "Samson defendants"

Two of the entities that plaintiffs have named as defendants are "Samson Resources" and "Samson Investments" (collectively herein the "Samson defendants"). The Samson defendants state in their corporate disclosure statement and their renewed motion to dismiss that there is a Samson Resources Company (an Oklahoma corporation) and a Samson Resources Corporation (a Delaware corporation). They presumes that plaintiffs have intended to sue Samson Resources Company, since that is the company that is engaged in the production of oil and gas from wells located in

Divide County, North Dakota and the complaint makes references to "Samson Resource Company" as being the operator of all but one of the wells in which plaintiffs claim an interest. The Samson defendants further state that the correct name for "Samson Investments" is Samson Investment Company, which they state is the parent of Samson Resources Company.

As discussed in more detail later, the named Samson defendants, along with other affiliated Samson companies, filed voluntary petitions for relief pursuant to Chapter 11 of the Bankruptcy Code on September 16, 2015. The Samson defendants contend that plaintiffs' claims in this action have either been discharged in the bankruptcy action or are now barred on the grounds of res judicata based upon plaintiffs having litigated their claims in the bankruptcy court and that court having determined they lacked merit.

### b. The "ONEOK defendants"

Plaintiffs also name as defendants ONEOK Partners, ONEOK, and OKS (hereinafter collectively the "ONEOK defendants"). The ONEOK defendants state in their initial motion to dismiss that: (1) the correct name of ONEOK Partners is ONEOK Partners, L.P., (2) the correct name of ONEOK is ONEOK, Inc.; and (3) that OKS is not an entity of any kind, but rather is the New York Stock Exchange symbol for ONEOK Partners, L.P. Based on the record before the court, the only reasonable conclusion is that the actual identities of the defendants named in the complaint are ONEOK, Inc. and ONEOK Partners, L.P. (herein "ONEOK Partners"), which, collectively, will be referred to as the "ONEOK defendants."

The evidence before the court is that, at the time of the filing of the complaint, ONEOK Partners was a publicly-traded master limited partnership with unit holders in Arizona. The fact that the presence of ONEOK Partners in this action destroys diversity jurisdiction unless corrected is

discussed later.

### c. Bakken Hunter and Magnum Hunter

Plaintiffs also name as defendants "Bakken Hunter" and "Magnum Hunter." Bakken Hunter and Magnum Hunter state in their initial joint pleading that they assume plaintiffs are intending to sue Bakken Hunter, LLC, and Magnum Hunter Resources Corporation. According to a later motion to dismiss filed by these entities, Bakken Hunter is an indirect subsidiary of Magnum Hunter, which has since changed its name to Blue Ridge Mountain Resources, Inc.

On December 15, 2015, Bakken Hunter and Magnum Hunter filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, but have since emerged from bankruptcy. Unlike the Samson defendants, neither Bakken Hunter nor Magnum Hunter contend that any claims that plaintiffs may have in this action were discharged in those bankruptcy actions.

Finally, since Bakken Hunter appears to be a limited liability company, the citizenship of its members at the time of the filing of the complaint would have to be determined to ensure that the court has complete diversity if this action was to continue.

### d. KKR

Plaintiffs have also named as a defendant in the complaint "KKR (Kravis, Kohlberg, Roberts)." This defendant states in its motion to dismiss that there is no entity named "KKR (Kravis, Kohlberg, Roberts)" and presumes plaintiffs have intended to sue Kohlberg Kravis Roberts & Co. L.P. (herein "KKR"). KKR states it is an investment advisor for investment funds that make private equity and real asset investments. KKR states it led a consortium of oil and gas investors that acquired Samson Investment Company in 2011 through an entity organized for purposes of the acquisition, which originally was named Tulip Acquisition Corporation but changed

its name to Samson Resources Corporation. KKR claims that, as an investment advisor, it did not own any equity interest in the Samson defendants and that, while equity interests in the Samson defendants were previously owned by affiliates of KKR, including certain investment funds managed by KKR, KKR did not operate or manage the business of the Samson defendants. KKR further states that, following the Samson defendant bankruptcies, KKR does not own any equity in or have any relationship with the Samson defendants.

KKR states there is also KKR & Co. L.P., which is KKR's parent company and a publicly-traded master limited partnership. KKR states that KKR & Co. L.P. may very well have had unit owners residing Arizona at the time of the filing of the complaint since it was publicly traded, which also would destroy diversity. For purposes of what follows, the court will presume that the only entity properly named and served is KKR (*i.e.*, Kohlberg Kravis Roberts & Co. L.P.) and not KKR & Co. L.P. However, it does not make a difference because all of the reasons set forth below for why KKR must be dismissed would also apply to KKR & Co. L.P. Further, if this action was permitted to continue as to either KKR or KKR & Co. L.P., or both, the court would have to determine the citizenship of their general and limited partners at the time of the filing of the complaint in order to ensure that the requirement for complete diversity would be satisfied.

Finally, plaintiffs repeatedly make reference in the complaint to "Samson KKR." Apparently, this reflects their speculation that KKR exercised actual control over the operations of the Samson defendants. Plaintiffs conclusory and speculative allegations that KKR and the Samson defendants were acting in concert do not make a difference in terms of the resolution of the motions to dismiss.

    **B.**     **Plaintiffs' "Amendment to Complaint"**

After the first motion to dismiss was filed, plaintiffs attempted to amend their complaint by filing a fourteen-page "amendment." (Doc. No. 30). As already noted, the amendment does not restate and amend the original complaint. Rather, it is clear from the pleading that plaintiffs intend that it be a supplement.

In the amendment, plaintiffs attempt to expand upon the defendants they claim are being sued by setting forth a long list of entities, purportedly related to either KKR or the Samson defendants, who have never been served and who have otherwise not appeared in this action. Aside from that, the fourteen-page amendment sets forth additional allegations with respect to the purported interrelationships among the original defendants and those that plaintiffs intend to add along with repeating a number of the conclusory allegations of fraud and wrongdoing on the part of the entities.

In responding to plaintiff's pleadings, most of the defendants have taken the position that, while they believe the attempted amendment was not proper, it does not make a difference since the complaint would have to be dismissed as to them even if the attempted amendment was given effect. Bakken Hunter and Magnum, on the other hand, argue that the only viable pleading is the amendment and, since the amendment (as opposed to the complaint) contains no specific allegations directed to them, they must be dismissed from the action for that reason alone.

C.    **The Samson defendants bankruptcy actions**

On September 16, 2015, the named Samson defendants (along with several other affiliated Samson companies) filed voluntary petitions for bankruptcy in the District of Delaware under the reorganization provisions of Chapter 11 of Title 11. The separate bankruptcy proceedings were jointly administered in the case entitled <u>In re Samson Resources Corp.</u>, No. 15-11934 (Bankr. D.

Del.) (hereinafter "bankruptcy action" or "<u>In Re Samson Resources Corp.</u>").

Plaintiff Lloyd Ness ("Ness") appeared pro se in the bankruptcy action, including filing a proof of claim for "royalties owed" contending that the amount of the claim with interest at 18% was between $75,000 and $1,000,000 (the "Ness claim").[3] (<u>In Re Samson Resources Corp</u>, Doc No. 677-3, p. 2). The Samson defendants filed an objection to the Ness claim and discovery ensued. On July 6, 2016, the bankruptcy court conducted an evidentiary hearing on the Samson defendants' objection to the Ness claim. (<u>Id.</u>, Doc. No. 1151). The transcript of the hearing ("Claim Objection Hearing") has been filed in this action at Doc. No. 96-4 and the page references will be to page numbers of the transcript.

During the Claim Objection Hearing, the Samson defendants presented evidence that included the following:

• The amounts payable to Ness from the production of wells operated by Samson Resources are governed by the terms of an oil and gas lease granted by Lloyd Ness's stepmother ("Ness lease"), which Ness ratified along with other members of the Ness family.

• The wells in question produced natural gas in addition to oil and there was no practical way to produce just the oil and not the natural gas.

• Because the North Dakota Industrial Commission placed limits on the amount of natural gas that could be flared, Samson Resources was required to capture and market the gas if it wanted to produce the oil, even if had to produce and market the

---

[3] While the court in other places refers to plaintiffs' interest in the gas production, it appears that any interest that Mrs. Ness might have (if any) would be that acquired through Mr. Ness. Only Mr. Ness appeared in the bankruptcy action.

gas at a loss.

- Before the gas could be marketed, it had to be processed for sale because the gas was too "rich" for use and also because certain liquids had to be removed. Because Samson Resources did not own the facilities and pipelines required to process and market the gas, it solicited proposals from some 10–12 "midstream processing companies" to purchase the gas. The party that Samson Resources selected and contracted with was a ONEOK affiliated entity, "ONEOK Rockies Midstream, LLC" ("ONEOK Midstream").

- ONEOK did not own an interest in Samson Resources and was not affiliated with it in any way. The contract with ONEOK Midstream was the result of an arm's length negotiation and reflected the most favorable terms available.

- Under the gas purchase contract, ONEOK Midstream deducted the expenses required to process and transport the gas from the amount paid to Samson Resources for the gas purchased.

- There was no other market for the gas that Samson Resources produced in substantial part because the only infrastructure in place that could take way and process the gas were facilities constructed and owned by a ONEOK affiliated company following the execution of the gas purchase agreement.

- Because there was no other market for the sale of the gas and Ness never took the gas "in kind," Samson employed a "netback method" of calculating the value of the gas at the wellhead for purposes of determining the amounts owed Ness for the produced gas based on his interests. The "net back" method involved taking Ness's

proportionate share of the gross revenue that Samson Resources was entitled to receive under the gas purchase agreement less Ness's proportionate share of the post-production expenses incurred by Samson Resources pursuant to the gas purchase agreement.

- During at least part of the time in question, the cost of processing the gas exceeded its market value. Hence, Ness received nothing for the gas that was produced. Also, for part of the period in question, Samson Resources deducted the excess expenses required to produce the gas from what was owed Ness on the oil production. Later, however, Samson Resources reversed course and reimbursed Ness and the other royalty owners the amounts that were offset from what was payable on the oil production without conceding its argument that it was entitled to make the offsets since the oil could not be produced without also producing the gas.

- From about November 2012 when Samson Resources started paying Ness for his interest in the production of the Samson operated wells through on or about the end of 2015, the post-production expenses, which were the principal focus of Ness's complaints, were just under two thousand dollars.[4]

(Claim Objection Hearing Tr. pp. 80–109).

During the hearing, Ness challenged the Samson defendants' evidence presented by the Samson defendants, including cross-examining the witnesses called by the Samson defendants and presenting his own evidence. The primary focus of what Ness presented was his contention that he was being cheated by the Samson defendants valuing the gas for purposes of calculation of the

---

[4] In this case, both Mr. and Mrs. Ness have sued. However, it clear that interests at issue were acquired by Mr. Ness and that Mrs. Ness does not have any independent ownership interest.

amounts payable on his interests by using the "net back" method, which resulted in him being paid nothing on the gas given the depressed prices market prices and, for a period of time, the excess expenses being deducted from the amounts payable on his interests in the oil production. Ness contended that the use of the "net back" method violated the terms of the Ness lease and was not otherwise permitted under North Dakota law.  (Id. at pp. 110–93).

Ness also offered as part of the defense of his filed claim the following:

- Ness contended the improper deducting of expenses violated federal securities law and offered an exhibit stating that factional undivided interests in oil and gas or other mineral rights are a security.

- Ness argued that a provision in the gas purchase agreement between Samson Resources and the ONEOK affiliate company amounted to an improper kickback.

- Ness complained about the 21 percent of the production that the ONEOK affiliate obtained under the gas purchase agreement for its processing fee.

- Ness claimed that Samson Resources and ONEOK could get away with ONEOK charging the expenses and purportedly kicking back amounts to Samson Resource because ONEOK was the "only game in town" and "that's called a monopoly."  He further referred to Samson Resources and ONEOK as being a "corrupt group."

- He further complained about the opaqueness of the information he and other royalty owners were provided by Samson Resources and suggested this was deliberately being done in order to cover up the corrupt and unlawful conduct.

(Id.).

Following the hearing, the bankruptcy court upheld the objection of the Samson defendants

and disallowed and expunged the Ness claim.  In so ruling, the court concluded:

- The court had jurisdiction to adjudicate the Ness claim and enter a final order.

- Neither the lease pursuant to which Ness's interest was calculated nor North Dakota law prohibited the use of the "net back" method of calculating the value of the gas for purposes of determining the amounts to be paid to Ness on his interests.  In so concluding, the court relied upon <u>Bice v. Petro-Hunt, L.L.C.</u>, 768 N.W.2d 496 (N.D. 2009), in which the North Dakota Supreme Court upheld the use of the "net back" method under lease language virtually identical to the Ness lease.  Further, the bankruptcy court noted that the North Dakota Supreme Court's decision in <u>Bice</u> relied in part on the same conclusion that the Eighth Circuit had earlier reached in <u>Hurinenko v. Chevron, USA, Inc.</u>, 69 F.3d 283 (8th Cir. 1995), when it predicted what likely was the law in North Dakota prior to the North Dakota Supreme Court definitively deciding the point in <u>Bice</u>.

- Samson Resources appropriately employed the "net back" method and properly deducted the post-production expenses challenged by Ness.

- Ness misread the provision of the gas purchase agreement that he contended amounted to a "kickback." The court concluded it did not have the nefarious effect Ness claimed.

- Ness had not proved that he suffered any loss as result of excess gas expenses being offset against the portion of royalty attributable to the oil production given the evidence of reimbursements made by Samson Resources.  However, even if there had been no reimbursement, Samson Resources had the right under the lease

language and North Dakota law to offset any excess expenses incurred in making the gas marketable against the amounts payable on the oil production. In reaching this conclusion, the court relied in part upon the lack of anything in <u>Bice</u> that would suggest a different result as well as the Eighth Circuit's decision in <u>Hurinenko</u>. <u>In re Samson Resources Corporation</u>, 559 B.R. 360 (2016). Finally, implicit in the denial of the Ness claim was Ness's inability to prove his contentions (1) that certain of the complained about expenses were improper or inflated, (2) the gas had been sold at below market prices, (3) he was the victim of fraud, or (4) that any federal law had been violated.

Ness subsequently moved for reconsideration and the Samson defendants objected. Following a second hearing at which Ness again personally appeared, the bankruptcy court on November 16, 2016, entered a written order denying the motion for reconsideration for the reasons articulated on the record at the hearing. (<u>In re Samson Resources Corp.</u>, Doc. Nos. 1408, 1633, 1661 and 1665).

Ness then filed an appeal with the district court. On August 23, 2017, the district court dismissed the appeal on grounds of lack of jurisdiction after concluding Ness's appeal was untimely. <u>Ness v. Samson Resources Corp.</u>, No. 16-1156 (D. Del. Order dated Aug. 23, 2017) (filed in this case at Doc. No. 96-3). There is no record of any appeal to the Second Circuit Court of Appeals. Hence, the decision of the bankruptcy court is the final decision in terms of the adjudication of the Ness claim.

Separate from the proceeding in which the bankruptcy adjudicated and denied the Ness claim, the bankruptcy court on February 21, 2017, affirmed a plan of reorganization that, in Article VII, § B, discharged the Samson defendants from all claims and causes of action of any nature

whatsoever that existed against the Samson defendants prior to the final effective date of the plan. (In Re Samson Resources, Corp., Doc Nos. 2019 (order approving plan) & 2019-1 (approved plan filed in this case at Doc. No. 105-1).

## II.    ANALYSIS

### A.    The lack of "federal question" jurisdiction

#### 1.    Introduction

Federal courts are courts of limited jurisdiction. Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994). The burden of demonstrating the court's jurisdiction is upon the party invoking it, and it may not be shifted to another party. See, e.g., Compart's Boar Store, Inc. v. United States, 829 F.3d 600, 604 (8th Cir. 2016); Great Rivers Habitat All. v. Fed. Emergency Mgmt. Agency, 615 F.3d 985, 988 (8th Cir. 2010). Because of this, Fed. R. Civ. P. 8(a)(1) requires that the complaint set forth a short and plain statement of the grounds for the court's jurisdiction.

As noted above, the only basis explicitly alleged in the complaint for the court's jurisdiction is diversity jurisdiction. On the other hand, plaintiffs have attempted to plead claims of violations of federal law. But simply claiming that federal laws have been violated is not enough. The allegations of violation of federal law must be "well-pled." See, e.g., Franchise Tax Bd. v. Construction Laborers Vacation Trust, 463 U.S. 1, 27–28 (1983) (federal question jurisdiction exists only in "those cases in which a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."); Great Lakes Gas Transmission Limited Partnership v. Essar Steel Minnesota LLC, 843 F.3d 325, 329 (8th Cir. 2016) (same).

In this case, the defendants all contend that plaintiffs have failed to plead viable claims of

violation of federal law.  Before turning to the federal laws that plaintiffs claim have been violated, the court will first outline the requirements for pleading a well-pled claim.

### 2.    Pleading requirements

To meet the minimal pleading requirements of Rule 8(a)(2) for stating a cognizable claim, something more is required than simply expressing a desire for relief and declaring an entitlement to it.  See Bell Atlantic Corp. v. Twombly, 556 n.3 (2007) ("Twombly").  The complaint must state enough to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Id. at 555.  Also, the complaint must state enough to satisfy the "plausibility standard" for stating a cognizable claim as established in Twombly and further amplified by the Supreme Court in Ashcroft v. Iqbal, 556 U.S. 662, 678–84 (2009) ("Iqbal").

Under the Iqbal/Twombly plausibility standard, the complaint must state enough factual matter, which accepted as true, states a claim that is plausible on the face of the allegations.  See id. A claim crosses the threshold of being plausible when the factual allegations do more than merely create a suspicion of a legally cognizable action and "raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.  Complaints that offer nothing more than labels and conclusions or a formulaic recitation of the elements are not sufficient. Twombly, 550 U.S. at 555; Iqbal, 556 U.S. at 680–81.   Determining whether a complaint states a plausible claim is "a context specific task" that requires the court "to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.  "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (quoting Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)).

Finally, even though a pro se litigant's complaint is entitled to a liberal construction, the

minimal pleading requirements of <u>Iqbal</u> and <u>Twombly</u> must still be satisfied. <u>E.g.</u>, <u>Story v. Foote</u>, 782 F.3d 968, 969 (8th Cir. 2015) ("To state a claim, . . . [the *pro se* litigant's] complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal quotation marks omitted and citing <u>Twombly</u> and <u>Iqbal</u>).

### 3.    Plaintiffs' claims of violation of federal law

Defendants contend that the complaint's largely conclusory allegations of violation of federal law fail to meet the <u>Iqbal</u>/<u>Twombly</u> requirements. For the reasons set forth below, the court agrees.

### a.    Alleged violations of federal securities laws

Plaintiffs refer in the complaint to (1)"The Securities Act," which they claim is also known as "the truth in securities" Act, (2) to "trading securities," and (3) "employing mathematical corruption to securities." However, plaintiffs have not set forth allegations that demonstrate how any federal securities law relates to what appears to be the thrust of their complaint, which is that defendants were somehow involved in a scheme to value the gas production from the wells in which plaintiffs' had an interest at below market prices and also to make improper deductions from the gas revenue. <u>Cf.</u> <u>Harris v. Union Elec. Co.</u>, 787 F.2d 355 (8th Cir. 1986). The mere fact that mineral or royalty interests at issue here might constitute a security for purposes of federal securities laws does not automatically invoke these law. Rather, to invoke federal securities laws, plaintiffs must be able to show a causal connection between the alleged wrongful conduct and some transaction that falls within the scope of the laws, *e.g.*, plaintiffs being induced to willfully purchase or sell a security that resulted in a loss to plaintiffs. In this case, plaintiffs have failed to allege sufficient facts to plausibly invoke the application of federal securities law in this case much less that any alleged fraud actually induced them to act as opposed to transactions that occurred simply as result

of their owning an interest.  See, e.g., McAdams v. McCord, 584 F.3d 1111, 1113–15 (8th Cir. 2009); Schaaf v. Residential Funding Corp., 517 F.3d 544, 549–50 (8th Cir. 2008).

### b.      Alleged violations of federal antitrust laws

Plaintiffs assert that defendants violated the Sherman Act and the Clayton Act, but do not specify which sections of the Acts or, even more importantly, the manner in which the Acts have been violated. To state a claim under § 1 of the Sherman Act, a plaintiff must plausibly identify an "illegal contract, combination, or conspiracy which results in an unreasonable restraint of trade." Double D Spotting Service, Inc. v. Supervalu, Inc., 136 F.3d 554, 558 (8th Cir. 1998) ("Double D") (quoting State Oil Co. v. Khan, 522 U.S. 3 (1997)); Twombly, 550 U.S. at ("[W]e hold that stating such a [§ 1] claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."). In this case, plaintiffs' complaint contains only threadbare allegations of an unlawful combination or conspiracy and nothing that plausibly suggests that the alleged wrongful conduct resulted in a restraint of trade.

To state a claim under § 2 of the Sherman Act, a plaintiff must "plead and prove that the defendant '(1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining it as a result of a superior product, business acumen, or historical accident.'" Double D, 136 F.3d at 560 (quoting Amerinet, Inc. v. Xerox Corp., 972 F.2d 1483, 1490 (8th Cir. 1992)). Plaintiffs' complaint fails to address these elements, much less plead sufficient facts to state a plausible claim under Section 2.

Finally, the complaint also fails to plead sufficient facts to set forth a plausible claim that

defendants engaged in conduct prohibited by the Clayton Act, much less that the conduct plausibly resulted in an unlawful restraint of trade.  See generally 54 Am. Jur. 2d Monopolies and Restraints of Trade §§ 138–72 (last updated Jan. 2019).

### c.  Alleged violations of Sarbanes-Oxley

Plaintiffs also allege that defendants have violated Sarbanes-Oxley.  However, they have failed to plead sufficient facts that would call into play its provisions, much less the limited few that create a private cause of action, *i.e.*, the anti-retaliation provisions under 18 U.S.C. § 1514A(a) or the provisions of 15 U.S.C. § 7244(a)(1) (Section 306) that prohibit directors and executive officers from trading during any blackout period equity securities obtained in connection with the providing of their services or employment.  See, e.g., In re Digimarc Corp. Derivative Litig., 549 F.3d 1223, 1230–33 (9th Cir. 2008) (holding no private right of action exists under Section 304 because, unlike Section 306, there is nothing in the law that suggests Congress intended a private remedy for violation of Section 304).

### d.  Alleged violations of RICO

Finally, plaintiffs also allege that defendants violated the Racketeer Influenced and Corrupting Organizations Act ("RICO").

> RICO prohibits "any person employed by or associated with any enterprise engaged in ... interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). RICO, however, "'does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity.'" Doe, 660 F.3d at 353 (quoting Gamboa v. Velez, 457 F.3d 703, 705 (7th Cir.2006)). To establish their civil claim under RICO, H & Q must show that the appellees engaged in "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" Nitro Distrib., Inc. v. Alticor, Inc., 565 F.3d 417, 428 (8th Cir.2009) (quoting Sedima S.P.R.L. v. Imrex Co., 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985)).

<u>H & Q Properties, Inc. v. Doll</u>, 793 F.3d 852, 855–56 (8th Cir. 2015) ("<u>H & Q Properties</u>").

In this case, the allegations in the complaint do not sufficiently address the required elements to establish a RICO claim. <u>See</u>, <u>e.g.</u>, <u>Nelson v. Nelson</u>, 833 F.3d 965, (8th Cir. 2016) (affirming dismissal of a RICO claim because plaintiff failed to plead sufficient facts as to the existence of an enterprise); <u>H & Q Properties</u>, 793 F.3d at 855–57 (affirming dismissal of RICO claim for failing to adequately plead "racketeering activity"); <u>Danielson v. Huether</u>, __ F. Supp. 3d __, 2018 WL 6681768, at *16 (D.S.D. 2018) ("<u>Danielson</u>") (pleading a RICO claim requires alleging the two or more related predicate acts that are claimed to constitute the pattern of racketeering activity). This includes the failure to plead with particularity the alleged fraudulent conduct as required by Fed. R. Civ. P. 9(b). <u>See</u>, <u>e.g.</u>, <u>H & Q Properties</u>, 793 F.3d at 856 ("Federal Rule of Civil Procedure 9(b) requires that [i]n alleging fraud ... a party must state with particularity the circumstances constituting fraud. The [c]ircumstances of the fraud include such matters as the time, place and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby.") (internal quotations and citing authority omitted); <u>Danielson</u>, 2018 WL 6681768, at *18 (failure to plead sufficient facts to state with particularity the fraud claimed to one of the predicate acts of racketeering activity as required by Rule 9(b)).

### 4. Conclusion re the federal claims and the lack of "federal question" jurisdiction

In summary, the court concludes that plaintiffs' conclusory allegations that the two oil field operators in this case conspired with others to set below market prices for the sale of oil and gas and then deduct from that the less-then-market-value stream of revenue improper deductions in calculating the amount of royalties owed plaintiffs are not enough to state plausible claims for relief

under any of the federal laws referenced by plaintiffs in their complaint.[5]  In the absence of well-pled

claims for violation of federal law, federal question jurisdiction is lacking.

### B.     The problems with plaintiffs' claim of diversity jurisdiction

In the seminal case of <u>Strawbridge v. Curtiss</u>, 3 Cranch 267 (1806), the United States

Supreme Court held that the exercise of federal diversity jurisdiction requires complete diversity

between adverse parties such that, if any plaintiff is a citizen of the same state as any defendant,

diversity is destroyed.  Since its decision in <u>Strawbridge</u>, the Supreme Court has not deviated from

this holding.  <u>See</u>, <u>e.g.</u>, <u>Americold Realty Trust v. Conagra Foods, Inc.</u>, __ U.S.__, 136 S.Ct. 1012,

1015 (2016);  <u>Exxon Mobil Corp. v. Allapattah Services, Inc.</u>, 545 U.S. 546, 553 (2005); <u>Carden v.</u>

<u>Arkoma Associates</u>, 494 U.S. 185, 187 (1990) ("<u>Carden</u>").

In <u>Carden</u>, the Supreme Court held  that the citizenship of each partner, including limited

partners, must be considered in determining the citizenship of a limited partnership.  494 U.S. at

187–98.  Further, the lower federal courts have held that the Supreme Court's holding in <u>Carden</u>

applies to master limited partnerships.  <u>Chace v. Magellan Ammonia Pipeline, L.P.</u>, No. 8:18-cv-

113, 2019 WL 78996, **4–7 (D. Neb. Jan. 2, 2019)  ("Master limited partnerships take on the

citizenships of their unitholders."); <u>Pathfinder Transport, LLC v. Pinnacle Propane, LLC</u>, 259 F.

Supp. 3d 949, 950–54 (W.D. Ark. 2017) (same).  And here, plaintiffs have failed to counter the

---

[5]  While the court reaches this conclusion based solely upon what has been alleged in the complaint and the attempted amendment, what transpired during the Samson defendants' bankruptcy action reinforces the conclusion that plaintiffs' conclusory allegations of some massive scheme to defraud (including "accounting chicanery,""kickbacks" and, allegations that what motivated the operators to cheat plaintiffs included KKR having loaded them up with debt) are nothing more than gross speculation—at best.   As already observed, the bankruptcy court concluded:  (1) that the "net back" method of valuing the gas at the wellhead, which  is the primary focus of plaintiffs claims of illegality, was lawful; (2) the specific basis for the alleged kickbacks (which was not pled in the complaint in this action) was simply Ness misreading the gas purchase agreement between Samson Resources and a ONEOK-related entity; and (3) that the Ness claim should be disallowed after he failed to demonstrate the impropriety of any of the complained about deductions or the sale of gas at below market prices, much less any fraud.

evidence offered by the ONEOK defendants that one or more of the unit owners of ONEOK Partners (which was a publicly-traded master limited partnership at the time of the commencement of this action) was an Arizona resident. Hence, at least as of the time of the filing of the complaint, complete diversity was lacking with the presence in the action of ONEOK Partners.

The general rule is that "[t]he existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed." Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 830 (1989). However, there are exceptions. One is that, pursuant to Fed. R. Civ. P. 21, a court can dismiss a non-indispensable party whose presence destroys diversity jurisdiction. See id. at 832–38.

In this case, the court concludes that, if the only reason for dismissing the entirety of this action is for reasons of lack of subject matter jurisdiction based upon the lack of federal question jurisdiction for the reasons explained and ONEOK Partners destroying diversity jurisdiction, the court would afford plaintiffs the opportunity to file a motion seeking to dismiss ONEOK Partners.[6] But, even with the dismissal of ONEOK Partners, diversity jurisdiction would not necessarily then exist. The court would also have to determine the citizenship of the members and limited partners of the remaining limited liability company and limited partnership defendants.[7] Also, the court

---

[6] The ONEOK defendants have advised that, as of June 30, 2017, ONEOK had acquired all of the outstanding common master partnership units of ONEOK Partners. However, there is substantial doubt that this cures the jurisdictional defect that existed at the time of the filing of the action even though, if this case was to proceed forward, plaintiffs likely could turn around and re-sue ONEOK Partners if it was dismissed solely to cure a jurisdictional defect based on lack of complete diversity at the time this action was filed. See, e.g., Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567 (2004) (post-filing change of composition of a limited partnership did not cure the jurisdictional defect of lack of complete diversity at the commencement of the action).

[7] Several of the defendants have argued that plaintiffs have failed to prove the existence of diversity of citizenship based upon the lack of information setting forth the citizenship of KKR, a limited partnership, and Bakken Hunter, a limited liability company. If this case was not dismissed for other reasons, the court would afford plaintiffs some opportunity for discovery or order (as the court has done in some cases) that the defendants supply the information required by the court to determine its jurisdiction. Also, the court assumes at this point that, in suing KKR, plaintiffs have not sued KKR & Co. L.P. If the court is wrong in making this assumption, then the question of complete diversity is likely even more problematic given that it is a publicly-traded master limited partnership and the likelihood of it having had one or more unit members who were citizens of Arizona at the time this action was commenced.

would have to address the more difficult question of whether the amount-in-controversy for purposes of diversity jurisdiction under § 1332 would exceed the $75,000 threshold.[8]

## C.    The motions to dismiss

### 1.    KKR, the ONEOK defendants, and Magnum Hunter/Bakken Hunter

The court has already addressed plaintiffs' failure to plead plausible claims of violation of federal law against any of the defendants. The court has also addressed the fact that the only state law claim that plaintiffs may have attempted to assert is one of fraud and here the complaint (even with the purported amendment) fails to (1) state a claim of fraud as to the KKR, the ONEOK defendants, and Magnum Hunter or Bakken Hunter that crosses the threshold of being plausible within the meaning of Iqbal and Twombly, and (2) satisfy Fed. R. Civ. P. 9(b)'s requirements of pleading with particularly given the absence of allegations with respect to time, place, and manner. For these reasons, the complaint (including the attempted amendment) is subject to dismissal as to these defendants for these reasons alone.[9]

### 2.    The Samson defendants

As already discussed, Ness filed a proof of claim in the Samson defendants' bankruptcy proceedings stating he was owed between $75,000 and $1,000,000— the same amount he contends is the amount-in-controversy in this case—and the bankruptcy court denied the claim following an

---

[8] Several defendants also argue that plaintiffs have failed to plead sufficient information demonstrating that the amount in controversy exceeds the monetary threshold in question and that the conclusory allegations of the plaintiffs are not enough. Given the court's other rulings, the court need not reach that question, but it may be a close one. See, e.g., Lipsey v. SEECO, Inc., No. 4:16-cv-000149, 2017 WL 2662677, at **4–5 (E.D. Ark. June 20, 2017) (plaintiffs failed to demonstrate that the $75,000 jurisdictional threshold could be reached in an action against the defendant for failure to pay the full amount of royalty due, even with an award of penalty interest, attorney's fees, and punitive damages, given that the underpayment was small).

[9] Even if plaintiffs had stated enough to plead a claim of fraud with respect to the Samson defendants, they have not with respect to Magnum Hunter and Bakken Hunter, who are hardly mentioned in the complaint and not at all in the purported amendment.

evidentiary hearing. "[The Supreme Court has long recognized that the process of claims allowance [in a bankruptcy proceeding] includes the dual determinations of both validity and the amount of the claim." In re Hann, 476 B.R. 344, 355(1st Cir. BAP 2012) aff'd In re Hann, 711 F.3d 235 (1st Cir. 2013).  As far as this case is concerned, the bankruptcy court's disallowance of Ness's claim is a final order that bars him from re-litigating the issues that were raised or could have been raised in the claim-objection proceeding and is separate from any discharge of his claims that occurred as a consequence of defendants' plan of reorganization having been approved.  Id. at 358–59; see also EDP Medical Computer Systems, Inc. v. United States, 480 F.3d 621, 624–27 (2d Cir. 2007).

With these principles in mind and after careful review of the record of the claims-objection proceeding, this court concludes that plaintiffs are precluded from litigating in this action (to the extent they may be attempting to do so in the less-than-clear complaint):  (1) any claim of violation of federal law or fraud on the part of the Samson defendants relating to what Ness was paid or not paid on his interests in the production of gas from the wells that were at issue in the claim-objection proceeding and arose prior to the commencement of the bankruptcy action; (2) any argument that the use of the "net back" method of valuing the gas in which Ness claims an interest by way of the Ness lease is contrary to North Dakota law or the terms of the Ness lease; (3) any claim that Samson Resources could not as a matter of law or the terms of the Ness lease deduct the excess of any expenses incurred in preparing the produced gas for sale against amounts owed with respect to the oil that was produced; and (4) any argument that the expenses claimed by Samson Resources and affecting the amounts payable to Ness prior to the commencement of the bankruptcy proceedings were  improper or that the gas was sold for below market prices.

Separate from the decision disallowing the Ness claim, the  bankruptcy court approved a plan

of reorganization that included a provision discharging the Samson defendants from all claims and causes of action of any nature whatsoever that existed prior to the final effective date of the plan with some exceptions not relevant here. This discharge had the effect of relieving the Samson defendants from any liability with respect to the claims asserted in the complaint and purported amendment, including any continuing damages accruing up to the final effective date of the plan. See, e.g., International Paper Company v. MCI Worldcom Network Services, Inc., 442 F.3d 633 (8th Cir. 2006) (per curiam) (debtor's approved plan of reorganization under Chapter 11 discharged plaintiff's state law claims of trespass, slander of title, and unjust enrichment); McSherry v. Trans World Airlines, Inc., 81 F.3d 739, 740 (8th Cir. 1996) (per curiam) (plaintiff's claim of violation of the ADA was discharged by the confirmation of debtors's ch. 11 plan of reorganization); 11 U.S.C. § 101(5)(A) ("The term 'claim' means--(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured."); 11 U.S.C. § 101(12) ("The term 'debt' means liability on a claim."); 11 U.S.C. § 1141(d) (with certain exceptions and except as otherwise provided in the plan or order confirming the plant, the confirmation of a plan "discharges the debtor from any debt that arose before the date of such confirmation").[10]

_____

[10] In one of their responses to the renewed motions to dismiss, plaintiffs appear to argue that their claims of fraud could not be discharged because of the exceptions to discharge under 11 U.S.C. § 523. If so, this is an argument that had to be made in the bankruptcy proceeding and then a timely appeal taken if disappointed by the bankruptcy court's adjudication. Putting that aside, however, the provisions that plaintiffs appear to be relying in § 523 apply only to Chapter 11 debtors who are individuals. See 111 U.S.C. §§ 523(a) &1141(d)(2).

Given the foregoing, the court concludes that the net result of (1) the bankruptcy's court's final order in the claim-objection proceeding, and/or (2) the discharge effectuated by the approved plan of reorganization is that plaintiffs' claims in this action must be dismissed as to the Sansom defendants. However, given the lack of record information to make a more precise determination (including what was the actual final effective date of the plan), the dismissal will be with prejudice up to the date of the commencement of the bankruptcy actions on September 15, 2015, and without prejudice thereafter even though the actual bar resulting from the final order of the claim-objection proceeding and the discharge may extend beyond that date.

**D.** **Whether the court should allow plaintiffs an opportunity to further amend the complaint before dismissing it**

Normally, the court would not dismiss the complaint of a *pro se* plaintiff for pleading deficiencies without first affording an opportunity to correct them. See Rush v. State Arkansas DWS, 876 F.3d 1123, 1126 (8th Cir. 2017). But here, plaintiffs have had more than sufficient opportunity in responding to the initial and supplemental motions to move to amend their pleadings—or least offer something which suggests that they have a plausible claim if the court was to afford them a further opportunity to amend—and they have not done so. Cf. Hubbard v. St Louis Psychiatric Rehabilitation Center, 556 Fed.Appx. 547, 548 (8th Cir. 2014) (unpublished per curiam). Further, the inability of Ness to prove to the bankruptcy court that there was anything nefarious about the manner in which the gas was being sold and the mineral interest owners being compensated by Samson Resources—including the use of the "net back" method of valuation and offsetting of the excess gas expenses against the amounts payable on the oil production that were the primary focus of Ness's complaints—makes it improbable here that plaintiffs will be able to amend the pleadings to state a plausible claim for violations of federal law or some overarching

scheme to defraud that they appear to be attempting to make.   And, if plaintiffs believe they have some other cause of action that has not been pled, then they need to commence a new action, which may have to be in state court unless they can satisfy the requirements for diversity of citizenship.[11]

## III.   ORDER

The motion at Doc. No. 114 for leave to file documents is **GRANTED IN PART**.  The documents at Doc. No. 114 will be deemed filed but shall remain sealed.

The court **GRANTS** the motions to dismiss at Doc. Nos. 14, 17, 37,  41, 46, 100, 103,  and 106, but only as follows:

1.     The   complaint   and   purported   amendment   are   **DISMISSED   WITHOUT**

---

[11] As already observed, there is nothing indicating that plaintiffs have attempted to plead a state law claim other than possibly for fraud.  But, even if plaintiffs had pled a breach of contract claim or possibly conversion, the bankruptcy court's conclusions that Samson Resources could use the "net back" method of valuation and offset any excess gas expenses against the amounts owed for royalty on the oil production would be res judicata and a bar to re-litigations of these issues, whether correctly decided or not, at least as to the Samson defendants.  Also, any other state law causes of action as to the Samson defendants would be subject to the bankruptcy discharge at least up to the effective date of the Samson defendants' reorganization plan.

Nevertheless, after reviewing the Ness Lease as introduced in the bankruptcy action, it does appears the bankruptcy court correctly decided the "net back" valuation and "excess expense" issues given the North Dakota Supreme Court decisions in Bice, supra, and, more recently, Kittleson v. Grynberg Petroleum Co., 876 N.W.2d 443 (N.D. 2016).  And, if the Ness interest in the production from the one well operated by Bakken Hunter/Magnum Hunter is also derived from Ness Lease, then the same likely applies for the gas production from that well.

Ness contended in the bankruptcy action that it would be unfair to apply Bice to the Ness Lease since it was decided in 2009, two years after the Ness Lease was consummated in 2007.  However, as explained by the bankruptcy court, the fact that Bice was decided two years later does not make a difference legally.  This court has previously remarked that mineral owners are well-advised to obtain the assistance of legal counsel when negotiating agreements like an oil and gas lease.  E.g., Martin v. Turner Oil & Gas Properties, Inc., No. 1:11-cv-102, 2013 WL 1183786, at *6 n.8 (D.N.D. Mar. 21, 2013).  This case is another good example.  Although the North Dakota Supreme Court did not decide Bice until 2009, courts in several other states had concluded prior to 2007 that the use of the "net back" method of valuation of the gas at the wellhead was permissible.  In fact, the Eighth Circuit concluded in 1995 in Hurinenko that it was a permissible method of valuation under North Dakota law.  An experienced oil and gas attorney would have been aware of these decisions and the possibility that the North Dakota Supreme Court would follow them.  Armed with that knowledge, an attorney assisting the Ness family may have been able to negotiate (depending, perhaps, upon how badly the mineral developer wanted the lease) alternative language of the type that the North Dakota Supreme Court concluded in Kittleson did not allow for the deduction of post-production expenses from the royalty owner's share of the gas production or language providing audit rights and penalty interest and attorney fees in the event of underpayment beyond what North Dakota law provides for.

Finally, the court is not unsympathetic to the difficulty of mineral owners being able to verify the validity of expenses being deducted from their share of the production and the opaqueness of some of the information they appear to have been provided.  This court has not kept up with the latest legislative and regulatory developments in this area, but the state legislature and the North Dakota Industrial Commission may be better forums for plaintiffs obtaining relief.

**PREJUDICE** for failure to state a cognizable claim as to: (a) ONEOK Partners, ONEOK, and OKS; (b) "KKR (Kravis, Kohlberg, Roberts)" or any other KKR-related defendant plaintiffs may have intended to sue in the complaint by use of that name; and (c) Magnum Hunter and Bakken Hunter.[12]

2. The complaint and purported amendment are **DISMISSED** as to defendants Samson Resources and Samson Investments. The **DISMISSAL** is **WITH PREJUDICE** with respect to any claim of violation of federal law or fraud that plaintiffs have attempted to plead in the complaint and the purported amendment and that accrued prior to the filing of the Samson defendant petitions in bankruptcy on September 16, 2015. Otherwise, it is **WITHOUT PREJUDICE**.

The other motions at Doc. Nos. 49, 58, 67, 70 and 71 are **DISMISSED FOR MOOTNESS**.

**IT IS SO ORDERED**.

Dated this 15th day of February 2019.

/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr., Magistrate Judge
United States District Court

---

[12] This dismissal takes care of any lack of complete diversity, including that caused by the presence of ONEOK Partners (*i.e.*, ONEOK Partners, L.P.) as of the time of the filing of the complaint.